AT A SPECIAL SESSION HOLDEN AT COLUMBUS, JAN., 1831.

---

### D. Z. AND D. C. COOPER *v.* MICAJAH T. WILLIAMS.

Court of equity can not control the canal commissioners, in using the quantity
of water necessary for the navigation of the canal, upon the complaint
of individuals claiming an interest in the water, nor in selling it for hy-
draulic purposes.

THIS was a suit in chancery to enjoin the defendant, one of the
acting canal commissioners, from selling certain water privileges
created by the location of the canal at Dayton, and was reserved
from the county of Montgomery. The bill alleged that the an-
cestor of the complainants was the owner of a large real estate in
and adjoining the town of Dayton; that this real estate was so sit-
uated as to give him the entire control of valuable water powers,
by taking the water from Mad river, a mile or more above its
mouth, and conducting it through his lands by races, and then
discharging it into the Great Miami river, either *east* of and above
the town, or south of and below the town of Dayton. That in

230

his lifetime he erected divers large and valuable mills, and in various modes appropriated and used these water privileges; and to prevent future collisions, he reserved to himself, his heirs, etc., the right of conducting water through most of the out-lots and lands sold by him, lying west of the road leading from Dayton to Waynesville, and south of the town of Dayton. That by his last will and testament he directed his executors to sell certain out-lots and lands for the payment of his debts, but reserving the same privilege of conducting water through them, and that the complainants, his children and residuary legatees, are entitled to said real estate, with all water privileges, etc. That in 1827 the board of canal commissioners located the *canal, a basin and feeder, at [254 Dayton. The canal was located on the east side of Dayton to Main Cross street; the basin from Main Cross street to First street, and the feeder was taken from Mad river, above the lands of the complainants, and upon the lands of James Findlay, and after passing southwardly and mostly through the lands of the complainants, discharged itself into the main canal a short distance below the saw-mill erected by the ancestor of the complainants. The canal, basin, and feeder were completed in 1829, agreeably to this location, and the bill avers that the feeder conveys an ample supply of water to the main canal for the purposes of navigation.

The bill further alleges, that at the time the canal, basin, and feeder were located, the canal commissioners agreed that a cut should be made from the head race of complainants' saw-mill to the basin, at or near its head, and the water thus turned might be used by the complainants for the purpose of propelling machinery; that this arrangement has been carried into effect on the part of the complainants, and the cut made and privilege leased to one Richards, who is erecting a valuable cotton factory upon the cut. It is also charged, that an agreement was made with the canal commissioners to raise the complainants' saw-mill wheel, to save the expense of a culvert, which has also been complied with by the complainants.

It is further alleged, that the complainants, without materially injuring their water privileges, can furnish a constant and ample supply of water for the canal, and that the commissioners by their dam across Mad river can always control a sufficient quantity of water by the feeder as located and finished. The complainants

231

also charge, that the defendant, in conjunction with others, and for private speculation, caused a new feeder and basin to be excavated; and that the defendant is about to divert the water from the old feeder to create a water power, and to sell the same for the benefit of the state, to the great detriment of the complainants. It is also alleged, that a much greater quantity of water is taken from Mad river, by the feeder, than is necessary to supply the canal, and thereby the property and water-works of the complainants are essentially injured.

255] *The bill prays for an injunction to prohibit the diversion of water from the old feeder, and the sale of a water power which would be created by such diversion; and also to prevent more water, than is necessary to supply the canal, from being taken into the feeder.

The defendant, in his answer, admits the location of the canal, basin, and feeder at Dayton, as set forth in the bill, and that the dam across Mad river will amply supply the canal through the feeder. He denies that any contract was ever made by him, or any other of the canal commissioners, that a cut should be made from the head race of the saw-mill to the basin; but says that at the time the basin was located, an objection was made by the guardians of the complainants and by others, that so large a body of water might endanger the health of the neighborhood, unless a current should be let into and pass through it; to this objection it was replied that such an evil might be avoided by making a cut and introducing a small wheel for light machinery. In this way, and to obviate said objection, and not to confer any peculiar benefit upon the complainants, the officers of the state permitted said cut to be made. Defendant admits that the complainants raised the saw-mill wheel twelve or eighteen inches, but denies that any agreement was entered into by which the state are bound to permit the water to pass through the mills into the canal, and alleges that the deposits of saw-dust, etc., in the canal, below the mill, have induced a belief that it may be necessary to abandon the present mode of admitting water from the mill. The defendant is unable to say whether the canal can be supplied by water from the mills or races of the complainants, but alleges that it has been determined by the proper officers under the law, that for obvious reasons it is not prudent to rely upon private individuals for a supply of water. He is also unable to say whether the com-

Cooper v. Williams.

plainants have been injured by withdrawing from Mad river the water necessary for the canal, but believes, with economy, the complainants would have sufficient water for their mills, etc., which were erected at the time of the commencement of this suit.

The defendant denies that he ever intended to change the location of the old feeder, or establish a new one, or that *he [256 ever authorized the excavation of a feeder to connect said basin with the canal, or established another basin or race, but alleges that said basin and race are the works of individuals, and managed at their own will and discretion.

The defendant admits that he was about to sell, for the benefit of the state, about two thousand cubic feet per minute of the water passing through the feeder, to be used for hydraulic purposes, and to be returned into the canal through the basin, race, and side cut, made by said individuals, leaving one thousand or fifteen hundred cubic feet per minute to pass into the canal through the first feeder, and insists he has a right so to do under the law. The defendant further alleges that the state have purchased about one and a half acres of ground, at the point where it is proposed to take the water from the feeder, for hydraulic purposes. This purchase was made by order of the canal board, in the form prescribed by law, and for the purpose of using the water from the feeder for hydraulic purposes.

The defendant denies that he ever caused or ordered more water to be thrown into the canal through the feeder than was necessary for the purposes of navigation, nor did he ever propose to sell water to such an amount as would increase the quantity necessary to be drawn through the feeder from Mad river, nor would the sale of two thousand cubic feet per minute, at the point owned by the state, produce that effect.

To this answer the complainants replied generally.

The complainants took the depositions of eleven witnesses: Isaac Pioneer, James Clymer, David Reid, Wm. M. Smith, Elisha Brabham, Amos A. Richards, John Sharter, John W. Vancleve, Alex. Grimes, Samuel Farrer, and T. Clegg.

The defendant took the deposition of James H. Mitchell.

An abstract of this testimony, so far as is deemed material, is here made, and arranged to the different points presented in the cause.

*First.* The works erected by the complainants, before the location of the canal was absolutely fixed.

Brabbham testified there was a merchant mill, with three runs of stones, a waste wheel to drive from two to four grindstones, a **257]** fulling-mill, with two water wheels, driving two sets *of fulling hammers, a carding machine, with one water wheel, driving two carding machines and one wool picker. A cotton factory, number of spindles not known, and a saw-mill with two saws.

There was no controversy but that the works here enumerated, were owned and kept in operation, by the complainants, before the canal was finally located.

*Second.* The works erected after the canal was located, and before the sale of water power was proposed.

Amos A. Richards testified, that he had erected a cotton factory, on a cut from the head race of complainants to the basin. That he had taken a lease for the water from complainants. That before he took it, complainants sent him to J. Farrer, principal engineer, to obtain permission to make the cut. That he went to Farrer, explained the object, and the quantity of water required; that Farrer assented; the race, or cut, was dug by a person whom Farrer recommended, and that Farrer was present while the cut was digging, and approved of it.

The testimony of this witness was unimpeached.

J. Farrer testified the wheels were raised by complainants, at their own expense, for the accommodation of the canal commissioners, and at a loss of a considerable portion of their water power.

*Third.* The injury sustained by complainants, by the abstraction of the water of Mad river into the canal feeder.

Upon his first examination, Brabbham testified that he had kept the complainants' merchant mills for eight or nine years. That during the last year there was a deficiency of water, for about four months, in the latter part of summer and beginning of autumn. That a part of the time all the water of Mad river was turned into the feeder, and the mills supplied by a waste way from the feeder, but all that could be spared from the canal was insufficient. In his latter deposition, he states that after August 1, 1830, the saw-mill stopped from a deficiency of water—the fulling mill was also stopped, and the merchant mill stopped after the 6th of August, except on nights and Sundays.

234

Cooper *v.* Williams.

Shartle testified that he had attended the saw-mill, for several years, and that in 1829 the mill did not run for two *months. [258- In his second deposition, he stated that the saw-mill was stopped for want of water, that they had from a hundred and fifty to a. hundred and sixty logs on hand; that if the saw-mill could go on it would be worth from ten to twelve dollars for every twenty-four hours, and that Mad river was not then lower than usual at. that season of the year. He further stated,.that before the open-- ing of the canal there was no deficiency of water for all the. works.

*Fourth.* With respect to the connection of the defendant with Seely's works, and the nature and character of the title to the land contracted for, by the state, where the sale of water power is proposed.

John W. Vancleve testified to the general correctness of the map produced. He also stated that the ground purchased by the canal commissioners was sold by H. Phillips to Seely, and by Seely to the state that Barr and Lodwick held Phillips' bond to Seely, and were prosecuting a suit against Phillips for the title.

Samuel Farrer testified that he had examined Seely's works, at. the request of the defendant, after the proposition to sell to the state was made. He stated, also, that defendant informed him his. brother was once concerned in a purchase of land connected with Seely's works; but that when he ascertained that Mr. Seely in-tended to sell the land to the state for water power, his brother,. at his urgent request, relinquished his interest.

There was much testimony as to the waste of water, the opin-- ion of witnesses concerning the relative injury and benefit of the canal to the complainants' property, at Dayton, and with respect. to the admeasurement of the water, its waste by absorption, and the effect of the sale of the proposed quantity of water, upon the water-works of the complainants, and upon their general interest. There was testimony, also, as to the capacity of the complainants' mill-race and other works to supply the canal with water, and the propriety of the state relying upon such supply.

James H. Mitchell was the only witness examined by the de-- fendant. His testimony applied to different views of the case. He stated distinctly, that should the water of Mad river be as. low as in 1829, and the state take three thousand, *cubic [259- feet per minute for the canal, Cooper's mills must stop. He also.

stated that no advantage would probably result to the state, by supplying, from the feeder, water for Seely's canal and basin, but the revenue from the sale of the water power.  He stated, in addition to this, that the water power from the feeder could be as advantageously used on the complainants' lands as at the point it was proposed to sell it.  The witness was the superintendent of the canal at Dayton.

HAMMOND, for complainant:

Upon this state of facts, two questions are presented for consideration.

1. The rights of the complainants, as against other individual citizens.

2. The rights of the state, under existing laws, and the tendency of the proposed measure to injure the complainants.

*First.* The water of the feeder to supply the canal, being taken out of Mad river, upon the lands of Findlay, lying immediately above those of the complainants, the first question is settled by deciding the relative rights of Findlay and the complainants. The doctrine upon this point is briefly but very distinctly laid down in 3 Kent's Commentaries, 353–359.  One result is, that the proprietor above can use the water while it runs over his own land. But he can not unreasonably detain it or divert its course.  He must return it to its ordinary channel when it leaves his estate.

Another result is, that the first appropriator of the water may, in consequence of such appropriation, and the enjoyment of it for a length of time, acquire absolute rights against an adjacent proprietor.  An uninterrupted enjoyment of the use for twenty years is held to extinguish an adverse claim, and to secure a perfect continued enjoyment to the first appropriator.

According to this doctrine, the right of the complainants to the use of the water, as against Findlay, was this: Findlay might use the water on his own land, but could not divert its entire course. He was bound to return it to its natural channel when it passed 260] through his estate.  And this he was *bound to do without reference to the quantity required by the complainants for their then use.  Their right existed, complete, to the use of the whole body of water that remained after the consumption for rightful use by Findlay; and that consumption must be upon his own land.

If an agreement had been made, by Findlay, with the proprietors of the lands below, which did not bound on the banks of the

Cooper v. Williams.

river, to take the water from Mad river, and conduct it from Findlay's land to theirs, and through their lands into the river at a point below the lands of the complainants, it would be a wrong which the law would redress. Take the case before the court, and separate it from the operations of the canal commissioners, and it well serves to illustrate the true doctrine on this subject. Suppose an agreement between Findlay and Seely, to supply Seely's canal and basin, as constructed. with water taken from the river, on Findlay's land, and returned to the canal at the point proposed. Could this be rightfully done, even if water enough be left in the river to work all the establishments of the complainants now erected? It is very clear to me that it could not. And for this reason: the use of the whole volume of the water is the property of the owner of the bed and banks. And each owner, both above and below, must use it with a direct reference to this right of property in others. The arrangements made by the ancestor of the complainants, to secure and preserve the full value of this water property, shows plainly that he contemplated using it all. It was his right to do so, of which no proprietor could deprive him. It is considered unnecessary to say more in support of the absolute right of the complainants to the use of the whole volume of the water of Mad river as against Findlay, subject to his use of it, upon his own lands.

The second point to be considered is, the rights of the state, and the effect of the proposed measure upon the interests of the complainants.

The right of the government to assume a disposition of private property, for public use, rests upon the great principle, that the interest and welfare of the whole are paramount to the interest and welfare of an individual. This principle rests upon the doctrine of necessity, but it is agreed by all *publicists, [261 that the necessity must be for a public use, and that use of a public character. Lands may be assumed for public highways, for public canals, for the erection of a public armory, or public buildings, such as a state-house, court-house, or jail; for without the land such works and buildings could not be constructed. Private houses may be razed to arrest conflagration, and personal property seized to supply an army. But the public use must be direct and necessary to render the public appropriation lawful. Kent justly remarks, 2 Com. 276, " It must undoubtedly rest in the wis-

·dom of the legislature to determine when public uses require the assumption of private property, and if they should take it for a purpose not of a public nature, the law would be unconstitutional .and void." The power to take it, even for a public use, is limited, by our constitution, to the case where compensation in money is made for it.

In enacting the laws for the construction of our canals, the legislature has acted with a scrupulous regard to these doctrines and principles. The first act was passed February 24, 1825, and sec-·tion 9 authorizes the commissioners to take possession of the "*lands, waters, streams, and materials*" necessary for the prosecution of the work, and provision is made for ascertaining the individual injury and making compensation. This was predicated upon the position that the public necessity warranted the assumption of the use of·individual property. Section 8 of this law authorized the commissioners to apply for and receive donations of land or other property in aid of the work. But no attempt is made to place the pr operty thus acquired upon any other founda-·tion than if held by individuals.

The next law passed on this subject is that of February 7, 1826. It is entitled, "*An act to provide for the increase of the canal fund by the purchase and sale of real estate.*" The very title of this law .shows that the legislature did not proceed upon the hypothesis of assuming property as necessary for the public use. Section 1 authorizes the commissioners to procure, by purchase or otherwise, a suitable quantity of land at each point on the canal where the water might be profitably used for hydraulic purposes; and section 2 authorizes a sale of the .lands or lots ceded to the state in 262] *aid of the canals, excepting those purchased with a view to hydraulic purposes. It can not possibly be maintained that this law contemplated thé acquisition by the state of any higher right than. that possessed by the individual from whom they might obtain a grant. And this is placed beyond controversy, as we think, by the provision of the law directing the disposition of this hydraulic power. Section 5 of the act of February 16, 1828, directs that "whenever, in the opinion of the board of canal commissioners, any water may be spared from any state canal, or works connected therewith, without injury to the navigation or ·safety of such canal, the board may offer a sale of such surplus water for a term of years, in their discretion, to the person who

238

shall bid the highest annual rent therefor: *Provided,* THE SAME
SHALL NOT IN ANY WISE INTERFERE WITH THE RIGHTS OF INDI-
VIDUALS." If the sale of water which the bill asks to have
enjoined *in any way interferes with the rights* of the complainants,
the law does not authorize, but in terms prohibits such sale.

We have seen that the proprietary right of the complainants to
the water, as against other proprietors, is absolute for the whole.
And we see that while the state assumes the use of the water for
navigating the canal, in virtue of her right of government do-
main or sovereign power, upon the ground of public necessity, she
does not attempt so to dispose of the water for hydraulic purposes.
This latter she justly regards as an affair of individual contract,
to be regulated by the same law that decides all other individual
rights.  She claims the public use of the water, but no pro-
prietary right which may, in any way, interfere with the rights
of individuals.

In this case, the ground purchased by the state for the use of
the hydraulic power of the canal was purchased from Seely.
While the ownership was in him, would it have been a legitimate
use of the water for the state to have sold him a right to use it for
hydraulic purposes, without regard to the interests and rights of
the complainants?  So to have proceeded would have been an
abuse of the power to take for public use.  Its operation would be
to take the water of the complainants and to sell it to a third per-
son.  In its most *qualified character, it would be connect- [263
ing a private with a public use—public gain with private specu-
lation.  If the state, in the case put, could not sell water power
from the canal to the proprietors of lands into which the water
was brought, without wrongfully employing the power to take for
public use, assuredly no new right could be acquired by pur-
chasing the land itself. · When the state purchases land to use in
a private trade and business for gain, she can acquire only the
rights of her vender.  All the legislation upon this subject shows
that it was so understood by the legislature.

Let us again recur to the right of the complainants.  It is abso-
lute to the use of the whole water of Mad river upon their lands,
through which it passes.  The power of the state, rightfully ex-
ercised, extends no further than to assume the use of this water
for navigating the canal.  The laws upon the subject are scrupu-
lously careful not to transcend the proper exercise of legislative

powers. Section 8 of the act of 1825, already quoted, in giving authority to "enter upon, and take possession of, and use lands, water, streams, and materials," adds a proper caution to the commissioners in these words, "*doing, nevertheless, no unnecessary damage.*" In the spirit, and, indeed, according to the very letter of this admonition, it was the duty of the commissioners, in using the water of Mad river for the canal, so to use it as to do no damage to the complainants' rights, which necessity did not render inevitable. Thus when the water was brought, by the feeder, upon the lands where it had been previously used by complainants, and where they had a right to use it all, except what was necessary for the canal, if its situation was such that the complainants could use it, from the feeder, without prejudice to the public use, they might reasonably claim the use. To refuse it is doing them "*unnecessary damage;*" to sell the use to others is worse than "*unnecessary;*" it is wantonly inflicting an injury. At the point where this controversy arises, the water power is not created by the canal. It exists independent of that work, and is the property of the complainants. Their ancestor had been careful to preserve the right to use this power exclusively in himself. The complainants have pursued the same policy. In this they are but
**264]** making what they deem the best *use of their own property; and it is their *right* to secure to themselves, if they can, the entire appreciation in value of all that is their own.' Does it not "*interfere*" with this "*individual right*" of the complainants to take this control of the water power from them and dispose of it. to others? That it does so interfere can not, I think, be disputed. On this single view of the effect of the sale it seems to me that the injunction ought to be made perpetual. The proof shows more serious and direct injuries. For two successive seasons the use of the water, for canal purposes, has occasioned a part of the works of the complainants to stop. And the proof also shows that, in the present season, a supply from the feeder has been refused to them. Such is the testimony given by Brabham in his last deposition. If, then, the state proceeds to sell water to a third person upon the opposite side of the feeder, it is clear that sending the water in that direction must prejudice the complainants greatly beyond the mere ordinary waste and evaporation. They can not then obtain a supply from the feeder, to which they are unquestionably entitled, when it can be had without injuring the naviga-

Cooper *v.* Williams.

tion of the canal. That it can be so had, is the very proposition upon which the sale of the water must rest. It is only in that case that the law authorizes such a sale. And the engineer, Farrer, testifies that the water can be taken from the feeder west, so as to be used by complainants as safely as where it is intended to sell it.

The case presented to the court is a strong one to demonstrate the impolicy of connecting private trade, for gain, with public works. Here a large sum of money has been expended in excavating a basin and a canal, with a view to build up a town, and divert to it a portion of the business transacted upon the public canal. This is all the work of private speculation, and its success must depend upon obtaining water from the public feeder. The persons engaged in this work buy a lot of land, on the feeder and from them the state becomes the purchaser. This being arranged quietly. the excavations are commenced and continued, and so soon as it is convenient for the proprietors to receive water into their basin and canal, and not before, the commissioner advertises a sale of the water. One can not resist the suspicion that *here was some understanding between the public agent [265 and the constructors of these works. It is improbable that they would have bought the lands and made the excavations without some well-grounded belief that the water power would be sold where it would best accommodate them. It is remarkable that the time appointed to sell happened to correspond most opportunely with their interests. It is worthy of note that the commissioner's brother should have been an original partner, and induced by the commissioner to sell out to save appearances. We may note, too, that while we learn the fact of selling out, the terms of that sale are not made known to us. And it is not the least remarkable circumstance that, so far as the commissioner is involved, there is some confliction between his answer and the testimony. These reflections only bear upon the cause as proving how much more this sale of water power partakes of private than public concern. In reality the adverse party in this case is a private company, whose views of gain are countenanced by the public agent. If permitted to succeed, the actual practical result must be a private speculation made at the expense of the complainants, which could not be effected without the instrumentality of a public agent. Justice and right, good principles, and sound policy,

all unite in support of the complainants' prayer for a perpetual injunction.

MASON, for defendant:

The power claimed by the agents of the state, to take the water of Mad river, and appropriate it to the construction of a navigable canal, is derived from the constitution, which declares that "private property shall always be subservient to the public welfare, provided a compensation in money be made to the owner." This power, as claimed and exercised by the agents of the state, in the act of taking and appropriating the water to the public use, is very properly conceded by the pleadings. To attempt, therefore, to prove what is not denied, would be a useless consumption of time. The power of the state to take private property for public use being admitted. the questions that seem to be presented for decision are:

266] *1. Whether the state, having acquired a right to the use of the water of Mad river for a navigable canal, may lawfully dispose of any part of it, for a purpose subordinate to, and not inconsistent with the end for which. the water was first appropriated.

2. If the state had not the power contended for, then, whether the complainants have shown such an *interest* in the subject matter in dispute, as entitles them to the relief they seek. And,

3. In case the complainants have shown themselves entitled to relief, to what extent ought the relief prayed for to be granted.

1. The legislature has granted power to the canal commissioners, and each of them, to enter upon, and take possession of any lands, waters, streams, and materials necessary for the prosecution of the improvements, intended by the act of February 4, 1825.

The validity of this grant of power is not contested on constitutional or other grounds.

What right, then, did the state acquire to the water taken and appropriated in execution of this power? This inquiry is essential to the determination of the first question.

By section 8 of the act just cited, it is enacted "that in case any lands, *waters*, streams, or materials *taken* and *appropriated* as aforesaid shall not be given or granted to this state, then the canal commissioners shall, on application of the owners of such lands, waters, etc., appoint appraisers, who are required to take an oath,

and to appraise the loss or damage, if any, of the owner of the *premises*, so required, for the purpose aforesaid; and the canal commissioners are directed to pay the damages so to be assessed and appraised; and the *fee simple* of the *premises so appropriated* shall be *vested* in this State.

Under the provisions of this statute, the state has acquired *possession* of its lands, waters, and materials taken and appropriated to the use of canals. And has, moreover, acquired not only the *right of possession*, but the *right of property* in the same. In which union consists a complete title to lands, tenements, and hereditaments. 2 Black. Com. 199. An estate in fee simple in the "premises," consisting of land, \*water, and materials passes [267 to, and is vested in the state. The state acquired all the title that was vested in the owner of the land, water, etc., at the time of the appropriation to public uses; and its title is adverse to the former proprietor. It is true, "nothing but an usufructuary property is capable of being had in water (2 Black. Com. 14), yet that element is capable of being held in fee simple; and the right of the proprietor to the exclusive enjoyment of the use is protected by adequate remedies for its violation.

It is said, on the other side, that the state claims the public use of the water; but not the proprietary right, which may interfere with the rights of individuals. The rights of the state have been wholly misapprehended; and to this singular misapprehension, must be attributed most of the errors that abound in the argument of complainants' counsel. If the complainants had a proprietary or other right to the water in question, they have been divested of that right, whatever it may have been, and their title to the fullest extent which they could claim to enjoy it, has, under the operation of the constitution and laws of the state, been transferred to the State of Ohio.

The state, in virtue of its *eminent domain*, appropriates to itself lands, waters, and materials for the construction of a navigable communication between remote points, within its jurisdictional limits, and when so taken and appropriated, the state acquires, from the very reason of the thing, and the express provisions of law, an estate in fee in the property so taken.

Suppose the land, water, or materials to have been acquired by the gift or grant of the individual proprietors, could any intelligent person be found so hardy as to contend that the title of the

state, acquired by such donation or grant, was not a " proprietary right," but an estate *at will* or *sufferance?* Is the title of the state, when obtained by the exercise of its sovereign power (which presupposes the consent of the owner, to be wanting), inferior to that vested in the state, by the other modes of acquisition? If this be constitutional law, then the power to take private property for public use was granted to no beneficial purpose. It is a mere delusion—nay, worse; for its exercise has drawn after *it, the expenditure of money, equivalent to the price of the thing taken; and hence, if the state, when it takes for the public use, and makes compensation to the owner, does not acquire, by that act, the absolute right to the property, it would have been better had the power never been granted.

The absolute right of the state, to hold in perpetuity, the *lands* of the complainants, taken for the construction of the feeder to the Miami canal, is nowhere controverted. Yet the complainants, on some principle, wholly unexplained, and to us incomprehensible, assert a right to the use of the *water* taken by the state, and appropriated to the same purpose with that of the land.

If the *land* and *materials* of the complainants, taken by the state, and appropriated to the public use, have, by that operation, and the payment of a consideration, become vested in fee in the State of Ohio, so has the water of the complainants, acquired in the same manner, and destined to the same public use, become vested in the state in fee simple.

If any distinction can be taken between the right of the state to water taken for public use, and that to land taken for the same purpose, it can be founded only on the difference existing in the nature of land and water. The largest estate in water that can be vested in an individual, is an usufructuary property. But this property carries with it, as an incident, the right to exclusive enjoyment within the boundaries of his land. Indeed, the right in others to control, disturb, or interfere with the enjoyment of his use, is excluded by the very definition of property. Would it not be an extraordinary proposition to advance, that the state, in the exercise of its sovereign power to take private property for public use, acquires thereto a title, exposed to greater insecurity than that of the individual from whom it had been taken.

The state takes, and appropriates water to construct a canal, and the right to do so is limited only by the obligation to make

compensation to the owner. Can the state be controlled in the use of the water, by the laws that regulate it, by individuals, whose rights are confined, in this particular, to the bounds of their own lands? So far from it, that the right of the state to the use of water taken for canal navigation *may be lawfully exercised [269 throughout its territorial limits. As an individual, by purchase, or prior occupancy, may acquire a right to the exclusive use of water, on his own land, in a particular way, so may the state, in the exercise of its sovereign power, to take for public use, acquire the same right to the use of water, in every part of the territory over which it has dominion.

How the state acquired its title to the water in question nowhere appears. It is to be presumed, therefore, in the absence of any allegation, or proof to the contrary, that the acquisition was lawful. That the complainants gave or granted the water to the state; or *that* not having been done, they applied to the proper tribunal for compensation, and that damages were awarded, or not, according to the real merits of the case. In either event, the rights of the complainants were divested and transferred to the state.

It now remains to inquire, under the first head, whether the agent of the state has power to dispose of some portion of the water, for any purpose subordinate to, and not inconsistent with the design of its original acquisition.

In some sections of the country through which the canals have been located, the want of sufficient water power had been severely felt, and this deficiency was greatly aggravated during seasons of drouth. To obviate an evil that retarded the progress of population and improvement within the sphere of its influence, and to give to the work, projected by the state, a larger capacity for usefulness, by creating a water power that should be commensurate with the necessities of the public, was among the conspicuous benefits intended to be secured by the adoption of the canal policy. These benefits, in connection with the no less important considerations arising from the interest which the people of the state have in the sale of this water power, are of a character that forbids their being yielded up without a very distinct knowledge of the grounds on which their surrender is demanded. These benefits, which entered into the contemplation of the projectors of the canals, and contributed largely to recommend their policy to the

approbation of the people and legislature of the state, must be thrown away, unless the water power, created by the construction 270] of the canals, can *be sold, or otherwise disposed of, according to the original intention of their projectors.

The legislature, not doubting its power over the subject, did, by section 5 of the act of February 16, 1828, direct the board of canal commissioners to sell, when in their opinion it might be done without injury to the navigation or safety of any state canal or works connected therewith, any surplus water for a term of years, to any person who would bid the highest annual rent therefor. The power to sell, delegated to the commissioners by this section, is derived from the absolute ownership of the thing directed to be sold. Its *extent* only, and not its *validity*, is questioned on the other side.

The supposed limitation of the power to sell is contained in the proviso to the section in these words, namely : " Provided, the same shall not in any wise interfere with the rights of individuals."

Treating of the proviso, the counsel for complainants says, if the sale of the water in any way *interferes with the rights of the complainants*, the law does not authorize, but in terms prohibits such sale. The whole argument of counsel proceeds on the hypothesis that the complainants still retain their original rights to the water taken from them by the state, and may interfere to regulate or control its disposition.

To uphold this preposterous theory, the proviso is adroitly construed into a legislative recognition of the right, on the part of the former owners of water, assumed by the state, and consecrated to the public use; to restrain the state from the sale of that water for hydraulic or other purposes. If this construction were admitted, the power to sell or dispose of the water would be nugatory. It could never be rightfully exercised without the consent of another, in any case where it could be shown that the water had once been private property. If the rights of the former owners are to be regarded, and their consent obtained as a prerequisite to the legality of the sale, the power claimed for the state had better at once be abandoned. For its exercise could, in most instances, be successfully challenged, it is believed on the ground of inter-271] ference with private rights—supposing *these rights to be retained by the former proprietors. Without adverting to the consequences resulting from the admission of such a doctrine, as

seen in the destruction which it would occasion to the best interests of the state, we maintain that the proviso was not intended to sanction a principle that would inevitably lead the state into collisions with the citizens, and expose it to the hazard of having its operations arrested, and its plans thwarted by every individual who might imagine himself to be injured, or his rights to be jeopardized.

No such intention could have been entertained, as certainly it is not expressed.

The construction contended for, has doubtless originated in a misconception of the persons whose rights were intended to be respected by the legislature. Not the former proprietors of water taken for public use, but the owners of lands adjacent to the water power, and whose lands, from their situation, might be exposed to the injury of being overflowed, or otherwise damaged by the use of the water, were intended to be protected by the proviso. At some of the points where water power has been brought into existence by the canals, the state has purchased a small lot of ground. But it is very certain that the water, after being used on this ground for propelling machinery, could not be confined within its limits, and consequently, the legislature foreseeing this result, provided against it.

We do not claim for the state, on account of its attribute of sovereignty, or otherwise, any higher or other right than an individual would have, to permit the water to flow on the lands of the adjoining proprietors. But lest such a claim might be advanced by the agents of the state, the legislature, from abundant caution, added the proviso in question.

It will be observed that the complainants have not asked relief on the ground of actual or threatened injury to their rights, as *owners of land* in the vicinity of the water power proposed to be sold; for no such injury, present, or prospective, is shown to exist. But they seek the interposition of the court on the ground of a pretended right to the water power itself; and they insist, in the prosecution of this right, that if the water be denied them, it shall not be disposed of to another.

*This conducts me to the consideration of the second question, namely: Whether the complainants have such an interest in the subject matter of controversy as entitles them to the relief prayed for.    [272

The right of the complainants to so much of the water of Mad

river as has been assumed by the state for the navigation of the canal, ceased and determined by that act of assumption; and they are as completely, and to the same extent, divested of all right and title to the *water* in dispute, as it is not denied they are to all that part of their *land* which was taken for the construction of the feeder. For aught appears, they gave or granted their right to the water. But supposing they did not, and that they claimed compensation for the injury, which was allowed and the money paid, what right have they to insist that they may pocket the money of the state, and at the same time control the use of the property they have lost? But suppose further, that application was made for damages, and the appraisers, believing none had been sustained, or that the residue of their real estate had increased in value beyond the injury done, refused to award damages, would these circumstances alter the case—would they impair the title of the state? As the question of compensation is not in issue; and as unfairness is not charged to have been practiced by the agents of the state in taking the property of the complainants, the title of the state is unimpeachable.

It is asked whether it would have been a legitimate use of the water, for the state to have sold to Seely a right to use it for hydraulic purposes, while he owned the ground which the state purchased from him, without regard to the *interest* and *rights* of the complainants? So to have proceeded, continues the argument of the other side, would have been an abuse of the power to take for public use. Its operation would be to take the *water of the complainants*, and to sell it to a third person. According to these views, the state has acquired no title whatever to the water of Mad river; for it is impossible, as a legal proposition, that the water can be owned at the same time by the state for one purpose, and by the complainants for another. If the state has a right to the use of it for navigation, the complainants have no right to the use of it for hydraulic purposes.

273] *If it would be an abuse of power to sell the water to a third person, it would be a more flagrant abuse of that power to *give* it away.

According to the argument of the gentleman the state's title is an amphibious thing—a perfect anomaly, and has no legal cognomen. Where the state uses the water for navigation then its title is perfect, and the complainants have no right to interfere—have no right to control the state in that particular use of the water. But should the state propose to use the water in another way,

doing no injury to the interests of navigation, then the original rights of the complainants to the water becomes resuscitated, then it is they assert the right of reclamation, on the ground, it is presumed, that the state, by attempting to abuse its power, has forfeited its right to use the water, which has thereby reverted to the former owners. Or, perhaps the complainants mean to assert a visitorial power only; such as belongs to the founders of eleemosynary corporations, to visit, inquire into, and correct all irregularities in the administration of its affairs.

But if it was intended to assert that a greater volume of water had been diverted from Mad river than was necessary to furnish an ample supply for all the purposes of navigation, then the language of counsel would be quite intelligible. If, however, it is intended to maintain that the complainants have a right, qualified or absolute, to the water assumed by the state, and which is necessary to supply the canal, we then resist the claim of the complainants, as one wholly irreconcilable with the power of the state to take private property for the public use.

Again it is said, that "at the point where this controversy arises the water power is not created by the canal. It exists independent of that work, and is the property of the complainants." That the water power is not created by the canal is an assertion we deny. Whether it was so created or not is a question of fact, which, if true, is susceptible of proof. The complainants, with the same right, and equal plausibility, might claim the water power created at any other point on the Miami line of canal as at the one in controversy. For there is not a doubt but that the water taken from Mad river, and to which the complainants lay claim, contributes *mainly to supply every level between Dayton [274 and Cincinnati. Hence it is clear, that any argument that could be employed to vindicate the claim of Cooper's heirs to the use of the water in the Dayton *feeder*, would as conclusively establish their right to the use of it at any point on the Miami *canal*. If it should be answered that they claim a right to use it at those points only where they own the *land* through which the feeder is located, and that the right asserted, is founded on the ownership of the *land*, we reply that all other proprietors of land on which the canal is located have an equal right to the use of the water on their own lands. And yet, in no other case has it been supposed that the ownership of the land through which the canal was located, drew

after it a right to the use of any water power that might be created there.

We assent to the doctrine that makes the right of the state to assume private property depend on the public use to which it is consecrated; and by this test are we willing to stand or fall. We admit, too, that the lands ceded to the state, or those which it may have acquired by purchase under the provisions of the act of February, 1826, entitled an act to provide for the increase of the canal fund by the purchase and sale of real estate, are all held by the same title that would have been vested by an individual, had he acquired them in the same manner, or by the same conveyance. Nor do we pretend that the state, in the disposal of this property, is not controlled by the laws regulating the transfer of property from one person to another.

What effect have these concessions on the power of the state to sell, or otherwise dispose of the water power in question? None whatever.

Again, it appears from the pleadings and proofs, that the water proposed to be taken from the feeder, after employing it on machinery, is to be conducted into the canal at some point below, not far distant from the point at which it was withdrawn from the feeder.

By this operation the public use of the water is not discontinued, but it is applied in aid of individual arrangements, without destroying or lessening its capacity to subserve the public welfare. 275] In this manner it is made a source *of revenue to the state, and at the same time it performs the functions originally intended to be fulfilled by its acquisition. Ought this economy of the resources of the state to be denounced as an abuse of the power to take private property for the public use? It might prove a difficult task to maintain the proposition, that to employ the vast water power brought into existence by the canals for propelling machinery, is a use not "subservient to the public welfare," within the terms and spirit of the constitution. According to the most restricted interpretation of the power we are compelled to acknowledge the "public welfare" would be promoted by multiplying the sources of wealth and prosperity, by increasing the comforts and supplying the wants of large and populous districts of the state.

Water applied to machinery, in the various departments of labor, is capable of exerting an influence more directly and exten-

Cooper v. Williams.

sively beneficial to the public than it could possibly do were it employed exclusively in navigation.

But the case is susceptible of being viewed in another aspect; and one which presents the power, for which we contend, in a light that dispels the doubts attempted to be thrown around it by the sophistry of the other side. The hydraulic power in question was created and brought into existence by the very act of constructing the feeder. It was the *effect*, not the *cause* of that work—it was the fruit or product of the capital of the state, expended for another object. Hence the power to dispose of it in the manner proposed is not less clear and incontestable than the power to levy and collect tolls from the canals, which are only fruits of another kind produced by the same cause.

Again: Take one of the cases mentioned by the counsel for the complainants, in which he admits that the state may lawfully assume private property for the public use. Suppose a mineral treasure discovered on the lands assumed for the erection of an armory, or other public buildings. To whom would it belong? To the state, or to the former proprietor of the land? According to every principle of law, no fraud having been practiced, it would be the property of the state. Would it be competent for the state to sell or lease the mine, as the only means of rendering it productive? *It would not, if the argument on the other side [276 in opposition to the power of the state to sell or lease water power, obtained by the construction of the canals, be well founded. Because it would be an abuse of the power to take private property for public use.

Were the armory, or other public buildings, necessary to subserve the general weal, they could not be erected without the land. It was, therefore, lawful to assume the land for a foundation to the buildings. But the ore in the bosom of the earth was not necessary to the erection of the buildings; it could not, therefore, be disposed of for any other purpose, without an abuse of the power to take the property of an individual and appropriate it to public uses.

According to his own principles, this would be the argument of the complainants' counsel.

Again: Suppose the state were to erect another capitol, and other public offices; would it be lawful to sell or let those now occupied? Or take a case precisely parallel with the one at bar.

The state owns a lot of ground, containing ten acres, acquired for the purpose of erecting a state-house, and other public buildings. But there is more ground than is necessary for the erection of all the public buildings. Has the state power to let or sell the surplus quantity?

Nobody doubts it. Suppose a room in one of the public offices might be disposed of, for private use, without detriment to the public service. Would a law authorizing an agent to let or sell it be unconstitutional? No one can be found bold enough to answer affirmatively. It is unnecessary further to multiply examples to illustrate the nature of the power for which we contend.

The result of the inquiry demonstrates, we think, that the complainants have failed to show such a title to the subject matter in controversy, as authorizes the court to grant the relief prayed for.

3. But if the complainants have entitled themselves to relief, to what extent ought the injunction prayed for to be decreed?

A review of the testimony applicable to this point may be proper. And respecting the quantity of water required for the safe and 277] easy navigation of the canal, the proof discloses *the following, among other facts. That the quantity of water flowing in Mad river has never been ascertained, otherwise than by the measurement of Judge Bates, who estimated the minimum discharge at seventeen thousand cubic feet per minute. This estimate, in the opinion of Mr. Farrer, one of our engineers, is too high. He says that, when first filling the canal, ten thousand cubic feet per minute were thrown into it—that probably one-half of this quantity will be sufficient in all future time. At present there are six thousand cubic feet per minute conducted through the feeder into the canal, but the quantity is now greater than is necessary. The exact quantity of water required for, or used in the canal, has never been, and, he says, could never have been ascertained, on account of the influx of water from the saw-mill race. The whole quantity of water which it is contemplated to introduce into the canal from Mad river, after the bottom and banks shall have become more firm and solid, is three thousand cubic feet per minute. The average waste of water, by evaporation and leakage, is estimated at one hundred feet per minute, to every mile of canal. The water power belonging to the estate of Cooper would not be diminished, except by evaporation and leakage, in consequence of

taking two thousand cubic feet of water through Seely's basin and canal; and the increased expenditure arising from these causes would, in the opinion of the engineers, be compensated by contributions of equal amount from the springs adjacent to that basin and canal, so that the loss of the estate would be nothing. It has never been proposed to take more water from Mad river than the quantity necessary for the supply of the canal. No additional quantity was intended to be taken on account of the two thousand cubic feet proposed to be sold.

Should the state use all the water delivered at the Tumbles, the estate of Cooper will have been increased in value.

Although it appears from this statement of the testimony, that the quantity of water required for the navigation of the canals has never been accurately ascertained, yet that more has been received into the feeder than was necessary for that purpose.

The excess, whatever it may be when correctly ascertained, is not, nor will it be claimed by the state.

*The answer of the defendant, on this point, is fully sus- [278 tained by the evidence. He denies that he had ever caused or ordered more water to be thrown into the canal, at Dayton, than was wanted for easy navigation; and that, if a greater quantity had been taken than was necessary for that purpose, it was without his orders, and he had not been notified of the fact otherwise than by the bill.

He further denies the imputed intention to sell or lease water to such an amount as would increase the quantity required for navigation, and says that the sale of two thousand cubic feet per minute would not have that effect.

And so say some of the most intelligent witnesses in the case.

The successful operation of the great improvements undertaken by the state, required that its agents should be clothed with extensive discretion and powers; and sound policy demands that the right of individuals to interfere, except in cases where the abuse of power is *palpable*, ought to be cautiously admitted. It is not every instance in which the keen eye of *avarice* may detect the loss of an opportunity for profitable investment, that will sanction such an interference. Can the complainants interpose and arrest the career of the state before sufficient time had been attained to ascertain, by the test of experiment, the quantity of water necessary for the navigation of the canal. Almost before com-

Cooper *v.* Williams.

mercial operations had been commenced—before plans, requiring time to ripen them into maturity, had been executed; and before results, existing only in prediction, and seen only in prospective, had had time to be realized, the complainants arrest the state, and demand judgment? Whence the necessity of this hasty interference?

But supposing the redress which the complainants seek be within the competency of the court to grant, and that they have not mistaken the forum to which they ought to have preferred their complaint—let us inquire whether the court can decree a perpetual injunction to restrain the defendant from changing the location of the present feeder, for the purpose of creating a new water power. This the court will not do; because the defendant never attempted, nor did he ever entertain the intention to make 279] the change, here deprecated. *And further, the court has no cognizance of the subject—no power to determine the question whether it would be expedient or inexpedient for the state to change the location of a canal or feeder. This power belongs exclusively to another—namely, the legislative department of the government.

And as to the diversion of the water from the feeder, and the sale of it by the state, they are so many acts competent for the state to perform in right of its absolute ownership.

As to the prayer that the state may be enjoined from turning into the present feeder more water than would be necessary to supply the canal for navigation, the state is ready to do, voluntarily, all that it is sought to have done compulsively.

Besides, the court can not determine, from anything before them, what quantity of water is admitted into the feeder beyond what is necessary for the purpose stated. The whole quantity now taken into the feeder, and *that* required for navigation, being accurately ascertained by measurement, then the excess of the former over the latter would be the part to be enjoined.

But ought the court, having a due regard to the character and interest of the state, to go further than to enjoin, in general terms, the agents of the state from withdrawing more water from Mad river than may be necessary to supply the canal with a quantity amply sufficient for all the purposes of navigation. To do this, would leave the government in possession of a discretionary power, essential to the preservation of the canals, and to the ful-

fillment of the high obligations it is under to the people of the state. To do more, would be to presume that the government of the state was capable of committing deliberate acts of injustice and oppression toward its own citizens.

If the court makes such a decision as admits the existence of a discretion on the part of the agents of the state in determining the quantity of water which the exigencies of the canal, at the present, or in future time, may demand, then the court will have decided nothing which is now controverted.

It may be permitted to be said, in explanation of some *things difficult to be understood without some knowledge [280 of paternity of this cause, that it may be traced up to the large capitalists of Dayton, with more propriety than to the complainants. Indeed, all its features and lineaments guide us to the true affiliation of the offspring.

It has not escaped the sleepless vigilance of the interested, that should the water power in question be sold, as contemplated, a rival town would spring into existence, and draw to itself a share of the business now transacted at the warehouses on the basin and canal. Then the point at which it is proposed to sell the water, would rapidly grow into importance, and probably check, temporarily, the growth of Dayton, requires not much forecast to perceive. Nor is it to be expected that the spirit of monopoly, after it has once got possession of the mind, will yield up its advantages without a struggle. These advantages, by long enjoyment, we are prone to regard, in the end, as our "rights and interests," and to complain of their loss as nothing less than the infliction of wanton injury.

Then the machinery of the complainants may be rendered less productive by the creation of rival establishments in their immediate neighborhood, but this is a damage for which the law has provided no remedy.

It is said that it is the right of the complainants to secure to themselves, if they can, the entire appreciation in value of all that is their own. And it is asked, if it does not interfere with the individual right of the complainants, to take this control of the water power from them, and dispose of it to others. And, in turn, we may ask, if it is not equally the right of the State to secure to itself the entire appreciation in value of all that is its own; and whether it is not an interference with this right for the complain-

ants to take the control of this water power, and dispose of it to others? The right to improve what is one's own, and to increase its value by all lawful means, is certainly not denied. But this right is limited by a due respect for the same right in others. The appropriation of so large a portion of Mad river to the public use has probably had the effect to injure the complainants for a time. But it is equally true that the injury has been counter-281] vailed by equivalent benefits, arising *from the appreciation of the residue of their real estate. Had no benefit, however, been realized by the complainants on account of the large disbursements of money in the construction of the canal, and the works connected therewith; still, as they were entitled to compensation, it must be presumed they have received it, to the full extent of the injury complained of. In either case the state acquired all the rights that belonged to the complainants; and, among these, the right to control the water power in dispute, and to dispose of it to others. The fatal error that taints all the reasoning of the counsel on the other side, in regard to the relative rights of the state and complainants, consists in the assumption that they have never parted with the ownership of the water, or that they and the state hold it by the community of interest; that both parties have a right to the use of the water in some way—the state for navigation, and the complainants for hydraulic purposes.

If the fallacy of this view has not already been sufficiently exposed, it is now too late to undertake it.

In conclusion, I beg leave to refer to the attempt to inculpate the defendant by a broad insinuation that he has prostituted his official functions to aid the interested views of unscrupulous speculation. To give color to the imputation, ingenious analogies are resorted to, and extraordinary coincidences are supposed—all tending to the proof of culpability. There is, however, not a fact established in the whole case which is inconsistent with that high character for integrity, firmness, and correct moral sensibility which the defendant has eminently sustained during the many years of his public employment. Since the publication of the argument of complainants' counsel, and with a view to repel the accusation leveled at the defendant, he has taken the deposition of Mr. Moore, and placed it among the papers in the cause. This deposition, to which I would respectfully invite the attention of the court, explains the nature of the connection which the defend-

Cooper *v.* Williams.

ant's brother once had with the projected improvements of Mr. Seely, and the time when that connection ceased. It shows con-clusively that the defendant never had any interest, direct or in-direct, in the success of that enterprise. No exculpatory evi-dence was, in the opinion of counsel, necessary; *but as the [282 defendant felt himself injured by the blow aimed .at his public reputation, they acquiesced in the desire he expressed to remove even a groundless suspicion of misconduct.

Mr. KELLY, an acting canal commissioner, on the same side:

Four questions only seem, to my apprehension, to present themselves for decision in this case:

1. Have the commissioners, as agents of the state, discretionary power as to the location and manner of constructing the canals, feeders, and other works necessary for giving to those works the greatest capacity for usefulness and security?

2. Can that discretionary power, if it exist, be interfered with or controlled, except in cases of its manifest and wanton abuse?

3. Has there been any such wanton and manifest abuse of the discretionary power vested in the commissioners in the case at bar?

4. In cases where water is taken from any stream for the use of the canal, has the original owner such an interest or property in it that he can follow the water and claim a quantum of hydraulic power equal to that to which he had a right when the stream flowed in its original channel?

The two first questions seem to me to be so conclusively settled, both by common sense and all the principles of law and equity with which I am acquainted, that I will not pay so poor a. compliment to the understanding of the court as to submit any ar-guments touching those points, but will barely remark that in the case of certain citizens of Chillicothe *v.* Canal Commissioners, praying an injunction against a certain location of the canal in the town of Chillicothe, the affirmative of the first and the nega-tive of the second question were fully sustained by the Circuit Court of the United States, at this place, in January last. The right of locating necessarily includes the right of changing the lo-cation.

The evidence and admissions in this case completely establish *the fact that there has been no manifest and wanton [283

abuse of the discretionary power vested in the commissioners; but, on the contrary, that to preserve a uniform flow of water into the canal, it was absolutely necessary that the agents of the state should have the entire control of the feeder and of the flow of water therein.

To arrive at a correct conclusion on the fourth point, it is necessary to take a more extended view of the case. The first question which presents itself in examining this question is, can this right of the original owner of the water, in the nature of things, be preserved to him, so that he can enjoy it without interfering with the rights of others? Economy and security of the work frequently require that feeders be so constructed, that the fall of the water which was originally distributed on the lands of two, three, or more owners, shall be brought together or concentrated at one point, and that point not on the land of either of the original proprietors of the power or fall. How, in such a case, can each claim and use his share of the power, without interfering with the other proprietors of the power, and especially without interfering with the owner of the soil? Again, can this ownership be exercised without interfering with the rights of the state as to preserving an equal flow of water? How far shall the agent of the state in such case control the flow of water, and how far shall the rights of the original owners extend in this respect? In cases where the state sells or leases water power, all these questions are settled by the arrangement of the works and by the terms of the lease or deed. But how are these questions to be settled in case the original owners follow the water and seek for and enjoy each his share of the power? Will the court settle these points, and fix the limits of the rights of the owners and of the state, by such rules and bounds as all parties shall understand and none shall ignorantly or willfully transcend? To my mind these questions present insuperable objections to the adoption of the principle that the original owner can follow the water and exercise acts of ownership over it.

If the original owners are divested of their rights by the appropriation of water to the use of the state, those rights must vest in 284] the state, and every principle of law, as well as *every consideration of public benefit and convenience, conspire to establish the doctrine that the water power may be sold or leased by the state, and the country receive the benefit of its profitable use.

Elaborate arguments for the defendant were also submitted by

Mr. Ewing, and by Messrs. Corwin & Collet, the insertion of which would swell the report to an unreasonable length; they are therefore omitted.

No argument was presented in reply, the arguments for the defendant not being presented until the meeting of the court, and the complainants' counsel being absent, had no opportunity to read them until after the decision.

Opinion of the court, by Judge Lane:

The proof in this case shows, that the plaintiffs are the proprietors of a tract of land on Mad river, near the town of Dayton, upon which a valuable water power exists, and is improved, and that a greater power may be created by diverting a greater quantity of water from the river. That it is necessary to take from the river three thousand cubic feet of water per minute to supply the Dayton canal, by which the value of the plaintiffs' milling privileges is materially impaired. That the canal commissioners have erected a dam on the land of Findlay, which lies above, and have constructed a feeder which transmits the water from the river, first through Findlay's land, next through a part of plaintiffs' land, thence upon the land of another person, from which it again enters the plaintiffs' land, and joins the canal. That, in the construction of this feeder, a new water power is created, which may be used either on the plaintiffs' land, or on the intermediate land, and that the defendant, who is one of the canal commissioners, is about to sell the right of using two thousand cubic feet of water per minute, to be taken from the feeder at some point between the two portions of the plaintiffs' land, and returned to the canal below. The bill prays general relief; but the pleadings direct the attention of the court to two points, which comprise the remedy he asks.

It is not an objection raised by the defendant that he is but *one of five commissioners, and that he only carries their [285 acts into execution; nor is a decree resisted on the ground that the whole board of canal commissioners are not principals acting in their own rights, but agents of the state only. The case is discussed by the respective counsel on the merits, and the court will view it in no other aspect.

We are first called upon to restrain the defendant from the unnecessary consumption of water. If it be proper for us to institute this inquiry, the evidence shows that three thousand feet per

minute is necessary, for the ordinary supply of the canal, at this point, and that this is all intended to be taken. And, although some irregularities exist in the quantity introduced, that they arise, partly from the accidental influx from other sources, or, perhaps, partly from the inexperience or want of attention in the superintendent, yet they chiefly spring from the variable quantity flowing through the race of the saw-mill, a volume under the control of the defendant. The evidence, therefore, does not support the plaintiffs' claim. But if it were otherwise, I am not sure it would be within the proper duty of the court to control the commissioners in the manner of supplying the canal with water. The power to construct the canal is a high attribute of sovereignty; and in tracing the line—in selecting materials for its construction —in the introduction and management of the water—and in the thousand subordinate operations, attending the execution of so vast a work, there is a necessity for the exercise of large discretionary powers. The board of canal commissioners are selected with special reference to their possessing capacities adapted to this work, and although a case strong enough to justify our interposition may arise from corruption, from malicious intention, or caprice, yet, in the absence of these, the court would pause before it will assume to control the discretionary powers the law intends to confide to them. The security, for the faithful exercise of this discretion, is found, not in the superintendence of courts of justice, but in the individual reputations of the commissioners—in the tenure of their office—in their acting openly on the rights of others, in the face of a people vigilant to watch and acute to 286] *discern, and in their being exposed to the overwhelming force of public opinion.

The more important question in this suit is, whether the court will restrain the sale of the two thousand feet of water to be taken from the feeder, between the point where it emerges from the plaintiffs' land and the point where it again enters upon it. The determination of this depends upon the nature of the plaintiffs' interest in the water flowing down the feeder.

The interest of a riparian proprietor, where his rights are not limited by usage or convention, consists in an absolute right to any use he can make of the water, while passing over his land. He is bound to transmit it by its natural channel to the next occupant, and he is permitted to exact the same "servitude" from

Cooper v. Williams.

the proprietor above him. The right thus acquired, is not a right to the water itself, but an interest in the manner of its flow; for the water in a running stream, flowing in its natural channel, is not a subject of property. 2 Black. Com. 18. The right, therefore, to all advantage of the river in its channel, to all benefit of the present mill race, and the right to create any other mill seat, which would permit the water to be returned to its natural channel before it left their land, were all vested and absolute in the heirs of Cooper, at the time of the creation of the canal, and they could not be deprived of them, except in due course of law.

It is upon these rights the state has assumed to act, by virtue of its transcendent sovereignty (*dominum eminens*), a power to appropriate private property for public uses, for the purpose of promoting the general welfare. This power is inherent in every government; but it should be exercised in cases, and for objects strictly public; and, in our country, the constitution of the United States, and of the State of Ohio, insure that principle of natural justice, which requires compensation to be made to the individual deprived of his property.

There is no doubt that a canal is such an object that private property may be subjected to its construction. By the act of 1825, St. 23, 56, 5, 8, the legislature have *authorized the com- [287 missioners to use the water of streams for this purpose, and the means of compensation is provided for those who suffer by the exercise of this power. The commissioners have abducted a portion of the waters of Mad river, by this authority, and the plaintiffs are entitled to a compensation for every injury resulting from this act. For every infringement of their rights—for every injurious interference with the control of their own property—for all detriment to a form of their mill privilege, they have received, and may receive satisfaction. And when satisfaction is thus made, and offered, their rights, so far as encroached upon, are extinct.

It remains to consider whether any new rights ensue from the transit of the canal, or its feeder, over the plaintiffs' lands, which entitle them to the relief they ask. In considering this question, it becomes important to ascertain the nature of the benefits, which ensue from the construction of the canal. They may be classed under the names of general or accidental. The general advantages are the facilities of traveling, accessibility to market, re-

duction of the price of transportation, and the effect of these, in enhancing the value of land. The accidental advantages consist of the peculiar benefit conferred upon specific tracts of land, by the opportunities of basins, warehouses, and other commercial advantages; of all benefits of the water, consistent with its use for the canal, and for the means of navigation, etc., from waste gates. To attain the general advantages, was the precise end for which the canal was constructed. They were designed for all—they belong to all, and may be claimed by all. But the accidental benefits, although often of the highest moment to the individual, are of a nature so indefinite and uncertain, that no vested rights exist to exact them from the agents of the state. The owner of land can not compel the commissioners to select black acre rather than white acre for the line of the canal; and although there ought to be an indemnity for injuries, there is no justice in a claim upon the state to make compensation for profits which might have accrued under a different location. This view of the case seems decisive of the plaintiffs' rights. They might exact from Findlay, the 288] transmission *of the water to them through its ordinary channel; but this right, so far as it extends to the three thousand feet of water, is extinguished by the transcendent sovereignty of the state. The commissioners possessed the undoubted power to take it from the river, and to conduct it through the land of the plaintiffs, to the point where it is proposed to sell the two thousand feet; up to this point there is no cause of complaint; and in consequence of thus using the water, a right to full indemnity ensues to the plaintiffs, and they have no further right. The water of the river is not theirs; certainly not this water, which never touched their land, except through the feeder. We can recognize no greater claim in the plaintiffs than that which attaches to every proprietor of land through which the canal might be brought—no such vested right, in accidental benefits or expected profits, as give them authority to interfere with the discretion reposed in the public functionaries. No case of corrupt intention or of malicious design is shown; and we can not regard, as an abuse of power, an attempt to diminish the pecuniary burdens of the people, by means, which, in our opinion, are no violation of any vested right.

Bill dismissed.

Judge Brush dissented:

A majority of the court are of opinion that the complainants have not made a case that warrants the interference of the court, in their behalf, to restrain the action and discretion of the agent of the state in the matter complained of. My mind has been conducted to a different conclusion. In assigning the reasons which influence my judgment, I do not purpose to answer the positions taken in support of the opposite opinion. I shall content myself with stating the case, as I understand it, and with explaining the principles of law by which I conceive the rights and the remedy of the complainants ought to do governed.

The material facts are:

*First.* The Miami canal has been constructed under the authority of law, from Dayton, on the Great Miami, to Cincinnati.

*Second.* The complainants, by descent from their father, *at [289 the time of the construction of the canal, owned a body of land adjoining the town of Dayton, through a part of which Mad river flowed, the water of which had been appropriated and employed, by the proprietor, for many years, in propelling grist and saw-mills, and factories of different descriptions, which were owned, and continued to be carried on, by complainants.

*Third.* In February, 1825, the canal was located. The plan required the water to be supplied from Mad river by a feeder, the course of which, with that of the canal and a basin, was settled upon and decided. Upon this plan the whole work was subsequently constructed and completed. The water was taken from Mad river, into the feeder, above the lands of the complainants upon the lands of the next adjacent proprietor, and above the dam from which they took the water for their own use. It was conducted through the adjacent tract into the lands of the complainants, and into the vicinity of their different water-works, and in such position as to be conveniently and safely used in aid of those works, and returned into the basin at the head of the canal.

*Fourth.* Before the water of Mad river was taken for the feeder there was an abundant supply for all the establishments of the complainants then in operation. But since the water has been used for the feeder there has been a deficiency of water, for the same operations, to an extent considerably injurious to these establishments.

*Fifth.* Subsequently to the completion of the canal some in-

dividuals, owning land on the side of the feeder, opposite to the town of Dayton, constructed a canal, with a view to private profit, for which a supply of water could only be obtained from the feeder at a proper point. At this point the board of canal commissioners purchased a piece of land, lying upon both sides of the feeder, for the purpose of disposing of the water power of the canal for the benefit of the state. The respondent, as acting canal commissioner, in conformity with the law, advertised the sale of the water. The place where the water thus to be sold was to be used was so arranged that the water, after having been used, would flow into the new canal, and pass through it into the pub- 290] lic canal, at a considerable distance below the *town of Dayton, and would be diverted from its course in the public feeder through the lands of the complainants to the lands of the constructors of the new canal. It is to prevent this sale and diversion of the water that the bill is filed and the injunction asked. It was allowed by the court of common pleas, and comes here upon an appeal.

Before the location of the canal and basin, in 1825, the complainants were invested with a complete and perfect right to the use of the water of Mad river, for any purpose that it could be used upon their own lands. This right was subject to no other restriction, but that they should not flow it back upon the proprietor above them, and that they should return it into the bed of the river for the use of the proprietor below them. 2 Johns. Ch. 164. The state, in its sovereign capacity, had no right to any portion of it. In the exercise of its sovereignty it could take it from the actual owner for an object of public character and of public utility. But this assumption of private property can not be made for the use of the government. It can only be made for the use and benefit of the people; for that description of use which every citizen may enjoy in the same manner and upon the same terms. It is this kind of use that constitutes the "*public welfare*," which I conceive to be distinct from government interest, profit, or concern. It is only this great and common benefit to all the people alike that creates a necessity authorizing and justifying the seizure, by the government, of the private property of individuals. It is the people's prerogative, exists in the social compact, and is founded in the maxim, "*salus populi suprema est lex*." The terms in which our constitution recognizes the principle, private prop-

Cooper *v.* Williams.

erty is " *always subservient to the public welfare,*" excludes its assumption or use in any other way, or for any other object or purpose whatever.

However enlarged and liberal the exercise of this prerogative, by the sovereign power may be, or ought to be held, it must have some limit. It will hardly be maintained, by the wildest adventurer for power, that the state may, at pleasure, assume to itself the franchise, or other rights or interests of individuals, to improve and dispose of them for the purposes of revenue. The sovereign may take that, *without which he can not pro- [291 mote the general welfare, in the sense I understand it, and no more. And even this power would be without limit, or the limit of no avail, unless the line can be drawn with such certainty as to become a *rule*, capable of illustration, and of being so stated that all, who are subject to it, may understand it.

In the case before us, the legislature seems to have understood this doctrine as I do, and they have attempted the definition in authorizing the assumption of private property for the great "*public welfare*" of constructing the canal. The public agents are authorized to "*seize and take*" what is required for the public use, "*doing no unnecessary damage.*" What does this mean, when reduced to a rule applicable to the case before the court? It seems to be plainly this: You may take from the complainants the use of their water necessary for the safe and secure navigation of the canal. But if consistent with this use, in the location where you have resolved to use it, a beneficial interest may still remain in them; you shall not deprive them of it. To do so is damaging them unnecessarily. To sell the water for government profit, in aid of the revenue, is to seize the complainants' property, not for the common use of all, in the same manner and upon the same terms, but is, in fact, fastening a burden of taxation upon ONE, which ought to be enforced equally upon ALL. This inequality of burdens is not necessary for the purposes of navigation, the great and principal object of the canal, and it is illegal if imposed for any other purpose.

I do not perceive how the case is affected by the position that the canal commissioners are clothed with the exercise of a sound discretion. The law certainly does not, and, indeed, under our constitution, could not, constitute them exclusive judges of what would be a sound discretion. That appertains to the judicial tribunals of the country. They alone can establish and apply the

*rule* of right, where individuals are concerned. Where public agents are about to transcend the legal limits of their authority, courts of equity adjudicate upon the matter, and enjoin their ir regularities if necessary. In the case of Shawd *v.* Aberdeen Canal Commissioners, 2 Dow. 519, Lord Eldon said : "If the canal 292] commissioners *exceeded their powers, they became trespassers, but chancery would restrain them by injunction, and keep them strictly within the limits of their powers."

In a still later case, an injunction was granted, in England, restraining defendants, acting under a private act of Parliament, from cutting a canal through land of the complainant in a manner not supposed to be within the equity of the statute. Cooper's Equity, 77.

Chancellor Kent cites these cases with approbation, 2 Johns. Ch. 168, 473, and admits that the complainant might have lain by and rested on his legal rights, and then brought trespass; but he was also at liberty to come into chancery, in the first instance, for a preventive remedy, and if there was any dispute as to the fact which course the complainant ought to pursue, chancery would direct an issue. It is a question of power, however an attempt may be made to confound its exercise with a sound discretion. In such a case, I believe it the safest rule, and the one most conformable to principle, and the letter and spirit of our constitution, to endeavor to ascertain the exact line of right, and then adopt Lord Mansfield's maxim, "*fiat justitia ruat cœlum.*"

The discretion confided to the canal commissioners by law is to assume private property for constructing the canal, and making it navigable. For these purposes, a necessity arises within the meaning of the terms "*public welfare.*" But is there any *public necessity* for the sale of the water power in question? Such a sale does not aid the navigation. It only aids the state revenue. If made, will it lessen the value of the property of the complainants? I can not entertain a doubt upon these matters. The proposed sale of water power is not *necessary* to the "public welfare," and it must operate very injuriously to the complainants. If doubt pressed upon my mind, still I should incline strongly to fix the strictest limit upon the governmental prerogative of assuming private property for public use, taking care that the great object of the canal, its safe navigation, should not be defeated, or its benefits impaired. This navigation is, in my opinion, the only legiti-

mate object of the canal. So far, therefore, as any advantage to the state, or to its revenues, may be contemplated by this sale of water power to the *prejudice of private right, I think the [293 strictest rule should be applied. I think, too, that in the case before us, the contemplated sale of water power is a sheer state speculation at the expense of the complainants.

It is objected that the state, having assumed the water, is under no legal obligation to permit, or dispose of the use of it to any one. Consequently, it may be conducted in the feeder, through complainants' lands, and the use of it refused to them with impunity. This point is not now before the court, but, in respect to it, it may be remarked, that possibly a court of equity might deem itself authorized to compel the agents of the state to allow the complainants to use the surplus water on their own lands, taking care that such use should never prejudice the secure and easy navigation of the canal.

From the best view I can take of the case before us, its turning point seems to be this: May the respondent, as a public agent, for the purpose of aiding the public revenue, do as he pleases with the water, however much his doings may prejudice the individual rights and interests of the complainants? My response is, *"I am unwilling."* Such, I think, ought to be the response of the laws and judicial tribunals of the country.

The converse argument runs thus: The canal commissioners have the *right*, that is, the *power*, to take the water out of Mad river, and conduct it, by a feeder, to the canal, for the purpose of navigation. Having it in motion, on the way to the canal, they may put it into market to raise revenue for the state, without any regard to the individual interests and rights of those who owned the use of the water before it was introduced into the feeder. I can not allow this. The discretion of all public agents, especially in the assumption of private property for public use, must be brought to the test of legal judgment. It must be controlled by some limit, and subjected to some rule. The application of that rule belongs to the judicial tribunals. They settle the bounds of official discretion, which has a continual tendency to encroach upon private rights. It is their province to arrest the exercise of that discretion, when it oversteps the requisitions necessary for the *"public welfare."* In this light, the proposed *sale of water presents [294 itself to my mind, and I would prohibit it. If any given quantity

·of water can be taken from the feeder, and returned to the canal, without injury to the navigation, the only legitimate object of state appropriation, I conceive it should be left with the original owners, whose right is the oldest, the best, and ought to be exclusively ·enjoyed.